HILO CRANE SERVICE, INC., Plaintiff, *v.* JAMES G.Y. HO, dba POLYNESIAN CONSTRUCTION CO.; FLORENCE J. HO; and STATE OF HAWAII, Defendants; and JAMES G.Y. HO, dba POLYNESIAN CONSTRUCTION CO.; and FLORENCE J. HO, Third-Party Plaintiffs, *v.* DANIEL R. MATSUKAGE; REAL ESTATE FINANCE CORPORATION; and CLIFFORD N. GAMBLE, Third-Party Defendants; and PACIFIC STANDARD LIFE INSURANCE COMPANY, Third-Party Defendant-Appellant and Cross-Appellee

(CIVIL NO. 5139)

RODRIGUES PLUMBING, INC., Plaintiff, *v.* JAMES G.Y. HO; FLORENCE JUDITH HO; MIDPAC LUMBER CO., LTD.; GRANGER-PACIFIC, INC.; BANK OF HAWAII; SHIELD-PACIFIC, LTD.; HILO CRANE SERVICE, INC.; WEACCO, INC.; HAROLD T. KURISU; KEN JOHNSTON; STATE OF HAWAII; and UNITED STATES OF AMERICA, Defendants; PACIFIC STANDARD LIFE INSURANCE COMPANY, Defendant-Appellant and Cross-Appellee; and PACIFIC STANDARD INVESTMENT & LOAN, INC., Defendant-Appellee and Cross-Appellant; MIDPAC LUMBER CO., LTD., Third-Party Plaintiff, *v.* NORIYOSHI MATSUMURA, Third-Party Defendant; and JAMES G.Y. HO and FLORENCE JUDITH HO, Third-Party Plaintiffs, *v.* DANIEL R. MATSUKAGE; REAL ESTATE FINANCE CORPORATION; and CLIFFORD N. GAMBLE, Third-Party Defendants

(CIVIL NO. 5261)

TOM OKANO ELECTRIC, INC., a Hawaii corporation, Plaintiff, *v.* JAMES G.Y. HO, dba POLYNESIAN CONSTRUCTION COMPANY; JAMES G.Y. HO, General Contractor; JAMES G.Y. HO and FLORENCE JUDITH HO, husband and wife, Lessees; STATE OF HAWAII, by the DEPARTMENT OF LAND AND NATURAL RESOURCES, Owner of Fee; MIDPAC LUMBER COMPANY, LTD., a Hawaii corporation, Surety; STATE OF HAWAII, by its DEPARTMENT OF

TAXATION; STATE OF HAWAII, by its DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS; REAL ESTATE FINANCE CORPORATION, a Hawaii corporation; UNITED STATES OF AMERICA, by its UNITED STATES ATTORNEY FOR THE DISTRICT OF HAWAII; KEN JOHNSTON; WEACCO, INC., a California corporation; HILO CRANE SERVICE, INC., a Hawaii corporation; and RODRIGUES PLUMBING, INC., a Hawaii corporation, Defendants; PACIFIC STANDARD LIFE INSURANCE COMPANY, an Arizona corporation, Defendant-Appellant and Cross-Appellee; and PACIFIC STANDARD INVESTMENT AND LOAN, INC., a Hawaii corporation, Defendant-Appellee and Cross-Appellant; and JAMES G.Y. HO, dba POLYNESIAN CONSTRUCTION COMPANY; JAMES G.Y. HO, General Contractor; and JAMES G.Y. HO and FLORENCE JUDITH HO, husband and wife, Third-Party Plaintiffs, *v.* DANIEL R. MATSUKAGE and CLIFFORD N. GAMBLE, Third-Party Defendants

(CIVIL NO. 5348)

NO. 9454

DECEMBER 21, 1984

BURNS, C.J., TANAKA, J., AND
CIRCUIT JUDGE DONALD K. TSUKIYAMA IN PLACE OF
ASSOCIATE JUDGE HEEN, EXCUSED

OPINION OF THE COURT BY TANAKA, J.

In a foreclosure case, defendant Pacific Standard Life Insurance Company (PSLIC) appeals from the judgment subordinating its first mortgage lien to the second and third mortgage liens of Pacific Standard Investment & Loan, Inc., now known as Pacific Loan, Inc. (Pac Loan). Pac Loan cross-appeals from the amended judgment reducing the judgment amount in its favor against defendants James G.Y. Ho (James Ho) and Florence J. Ho (collectively the Hos). As to both appeals, we reverse.

# I. FACTS

### A. *The Corporate Entities and Individuals Involved*

The identification of the various corporate entities and individuals and their relationship are important in the analysis and discussion of this case.

Pacific Standard Life Company (Parent Company) is a Delaware corporation.

PSLIC is an Arizona corporation engaged in the insurance business. It is a wholly owned subsidiary of Parent Company.

Pac Loan, a Hawaii corporation, was incorporated in 1971 and is a licensed industrial loan company under Hawaii Revised Statutes (HRS) chapter 408. From the date of its incorporation until September 29, 1975, Pac Loan was a wholly owned subsidiary of Parent Company.

Real Estate Finance Corporation (REFC), incorporated in 1964, is a Hawaii corporation and a mortgage banking company. From 1969 until September 29, 1975, REFC was a wholly owned subsidiary of Parent Company.

PSL Associates, Inc. (PSLA), a Hawaii corporation, is engaged in the general insurance agency and insurance brokerage business. Until September 29, 1975, PSLA was a wholly owned subsidiary of Parent Company.

Since its incorporation in 1970, Aloha Development Corporation (Aloha Development) has been a wholly owned subsidiary of Parent Company.

By agreement dated September 29, 1975, Parent Company sold, and Daniel R. Matsukage (Matsukage) and his wife Nobuko Matsukage (collectively the Matsukages) purchased, all of the issued and outstanding shares of capital stock of Pac Loan, REFC, and PSLA for $1,024,577.30, payable $102,457.73 down and $922,119.57 by way of a promissory note. The agreement required the Matsukages, *inter alia*, to elect two nominees of Parent Company to the boards of directors of Pac Loan, REFC, and PSLA so long as the promissory note remained outstanding.

As nominees of Parent Company, Clifford N. Gamble (Gamble)

and Edgar L. Fickle (Fickle) were elected to Pac Loan's 4-member board of directors[1] on September 30, 1975. Gamble and Fickle were reelected and continued to serve as directors until July 19, 1978.[2]

Gamble was a shareholder, chairman of the board, chief executive officer, and director of Parent Company from 1967 and during all relevant times. He also was the chairman of the board of PSLIC during the same period of time and served as PSLIC's president and chief executive officer from 1967 to December 1978. During 1976 and 1977, he was a director and officer of Aloha Development. As indicated above, Gamble served as director of Pac Loan from September 30, 1975 to July 19, 1978.

Fickle served as a director of Pac Loan from 1971 until July 19, 1978. He also served as Pac Loan's vice president from March 9, 1973 to September 30, 1975. He was PSLIC's executive vice president and director from 1967 and during all relevant times. During all relevant times in the case, Fickle served as executive vice-president, treasurer, and director of Parent Company, and a director of Aloha Development. He was a director of REFC from 1969 to 1975.

Matsukage served as a director of Parent Company from 1969 to 1975. He served as an officer and director of Pac Loan and REFC even while they were subsidiaries of Parent Company. He was Pac Loan's president and director from 1971 to sometime in June, 1981. He also served as president and director of REFC from 1964 and during all relevant times. From 1973 through 1976, Matsukage was a director and an officer of Aloha Development.

In 1981, Pac Loan was in financial straits and in violation of certain industrial loan laws. The state bank examiner offered Matsukage the alternative of either turning over all shares of Pac Loan's capital stock to Thrift Guaranty Corporation of Hawaii[3]

---

[1] Matsukage was one of the other two directors.

[2] The Matsukages paid off the promissory note payable to Parent Company sometime in 1978.

[3] The Industrial Loan Company Guaranty Act, Hawaii Revised Statutes (HRS) chapter 408A (Supp. 1983), was enacted in 1977 for the purpose of guaranteeing the payment of up to $10,000 for each thrift account with an industrial loan com-

(Thrift Guaranty) or having Pac Loan placed under receivership. The Matsukages agreed to the former alternative and Thrift Guaranty became the sole shareholder of Pac Loan in June 1981. Thereafter, Pac Loan changed its name from Pacific Standard Investment & Loan, Inc. to Pacific Loan, Inc.

The first of the three mortgages in question had its genesis in 1974. In December 1974, the Hos were the owners of a leasehold property located on Banyan Drive, Hilo, Hawaii (Banyan Property).

## B. *The Mortgage Loans*

On December 27, 1974, the Hos borrowed $1,900,000 from REFC for the construction of a hotel on the Banyan Property. The loan was evidenced by a note to mature in one year and secured by a mortgage encumbering the Banyan Property. On December 30, 1974, REFC assigned the note and mortgage to PSLIC.[4] The mortgage and assignment were duly recorded. The December 27, 1974 mortgage is hereinafter referred to as the "PSLIC Mortgage."

On October 1, 1975, the Hos executed and delivered to Pac Loan a $66,000 note payable on April 1, 1976, which was secured by a mortgage encumbering the Banyan Property (Loan 550). The recorded mortgage stated that it was subject to the PSLIC Mortgage. From the Loan 550 proceeds, the Hos received $9,838.92 and the balance was used to refinance Loan Nos. 460 and 520 which were unsecured.

On April 28, 1976, the Hos executed and delivered to Pac Loan a $50,000 note which was secured by a mortgage encumbering the Banyan Property (Loan 598). The recorded mortgage stated that it was subject to the PSLIC Mortgage and the Loan 550 mortgage.

---

pany, HRS § 408A-4 required all industrial loan companies which had issued outstanding thrift accounts to establish a nonprofit corporation named the Thrift Guaranty Corporation of Hawaii which would establish and maintain a guaranty fund by levying assessments on its members. HRS § 408A-7 authorizes the bank examiner to apply for the appointment of Thrift Guaranty as a receiver for industrial loan company with thrift accounts.

[4] On October 30, 1978, PSLIC assigned the December 27, 1974 note and mortgage to Norfolk Investment, Inc., a Hawaii corporation. However, the assignment was cancelled on December 31, 1980.

On December 29, 1976, PSLIC loaned $250,000 to the Hos. The loan was evidenced by a note and secured by an additional charge mortgage on the Banyan Property. The additional charge mortgage was recorded.[5]

## C. *The Judicial Proceedings*

James Ho, doing business as Polynesian Construction Co., was the general contractor for the hotel project on the Banyan Property.

In 1978, three subcontractors filed complaints to foreclose their mechanics' and materialmen's liens (mechanics' liens) — Hilo Crane Service, Inc. (Hilo Crane) in Civil No. 5139, Rodrigues Plumbing, Inc. (Rodrigues Plumbing) in Civil No. 5261, and Tom Okano Electric, Inc. (Okano Electric) in Civil No. 5348. On November 13, 1979, Civil Nos. 5139, 5261, and 5348 were consolidated for hearing and trial.

The consolidated cases name the Hos, PSLIC, Pac Loan, REFC, Matsukage, Gamble, and other alleged lienors as defendants or third-party defendants. The pleadings include many cross-claims by various parties against other parties.

On October 21, 1981, the circuit court found mechanics' liens in favor of Hilo Crane ($12,230.98), Rodrigues Plumbing ($37,533.33), and Okano Electric ($15,497.02) and entered its foreclosure decree appointing a commissioner to sell the Banyan Property. At a public auction held by the commissioner on December 7, 1981, PSLIC was the sole bidder at $1,000,000.

At the confirmation hearing on January 14, 1982, PSLIC's counsel represented to the court that, subject to the confirmation of the foreclosure sale, PSLIC had agreed to (1) settle and purchase the claims of Hilo Crane, Rodrigues Plumbing, and Okano Electric; (2) settle and purchase the claim of another mechanic's lienor, Midpac Lumber Co., Ltd.; (3) bring delinquent lease rents of approximately $42,400 current; (4) pay the accrued but unpaid real property taxes of about $79,129; (5) pay the commissioner's fee

---

[5] PSLIC does not claim that the additional charge mortgage has priority over Pac Loan's mortgages (Loans 550 and 598).

($15,000) and costs ($1,931.72); and (6) not assert against or pursue the Hos for any deficiency arising from the proceedings — the amount owing under the PSLIC Mortgage loan being $3,170,286.77 and under the additional charge mortgage loan being $250,000 plus interest.

On March 5, 1982, the circuit court entered its orders, *inter alia,* (1) granting PSLIC's December 18, 1981 motion for partial summary judgment, thereby determining that the PSLIC Mortgage was valid and the debt thereby secured was $3,170,286.77; (2) approving the commissioner's report and confirming the sale of the Banyan Property to PSLIC for $1,000,000, subject to PSLIC's agreements disclosed at the confirmation hearing; and (3) providing for a subsequent trial to determine the priorities of the liens of PSLIC, Pac Loan, and any other parties.

A bench trial to determine lien priorities commenced on April 23 and concluded on April 29, 1982. All other parties having dismissed their claims, disclaimed, or been defaulted, the only parties involved in the trial were PSLIC and Pac Loan.

On May 4, 1982, the circuit court entered a $227,628.48 judgment for Pac Loan against the Hos (May 4, 1982 Judgment). This was based on the court's February 2, 1982 findings and conclusions that the Hos owed Pac Loan $126,949.23 on Loan 550 and $100,679.25 on Loan 598 and that the mortgages securing those loans were valid liens on the Banyan Property.

On May 12, 1982, PSLIC filed a motion for relief from the May 4, 1982 Judgment. PSLIC contended that (1) evidence adduced at the priorities trial revealed that on April 1, 1978, $38,423.98 had been paid on Loan 550 and (2) although the judgment was against the Hos, PSLIC will be adversely affected by the erroneous judgment if the court should subordinate the PSLIC Mortgage to Pac Loan's mortgages. On December 22, 1982, the circuit court entered its order recognizing the April 1, 1978 payment or credit of $38,423.98, reducing the Loan 550 balance to $27,576.02, allowing interest thereon from April 1, 1978, and reducing the total judgment from $227,628.48 to $128,247.33. An amended judgment of $128,247.33 for Pac Loan against the Hos was entered on the same day (December 22, 1982 Amended Judgment).

On December 30, 1982, the circuit court entered its findings of

fact and conclusions of law (December 30, 1982 Findings and Conclusions) whereby it subordinated PSLIC Mortgage to Pac Loan's mortgages securing Loans 550 and 598. In accordance with the December 30, 1982 Findings and Conclusions, a final judgment in favor of Pac Loan was filed on June 2, 1983.[6]

Thereafter, PSLIC appealed and Pac Loan cross-appealed.

## II. PSLIC'S APPEAL

PSLIC does not challenge any of the trial court's findings of fact. However, it contends that conclusions of law Nos. 10, 11, and 12 in the December 30, 1982 Findings and Conclusions are erroneous. Those conclusions read as follows:

10. It would be inequitable under the facts of this case to allow PSLIC to have a prior lien over Pac Loan to the proceeds of sale of the security in this foreclosure action since to do so would allow Parent Company, Fickle, Gamble, and Matsukage to profit from their inequitable conduct.

11. The mortgage liens of PSLIC on the Banyan Property is subordinate to Pac Loan's mortgage liens securing [Loans 550 and 598].

12. Pac Loan is entitled to be paid according to the AMENDED JUDGMENT (filed 12/22/82) from the proceeds of the sale of the subject property prior to any payment to PSLIC.

Record, Vol. 13 at 89.

It is clear from the record that the trial court's conclusions subordinating PSLIC's Mortgage lien to those of Pac Loan's was based on the doctrine of equitable subordination urged upon the court by Pac Loan.

For the reasons stated below, we hold that, based on the facts in this case, the trial court erred in applying the doctrine of equitable subordination.[7]

---

[6] By Order Directing Entry of Final Judgment filed on May 17, 1983, the circuit court made a Rule 54(b), Hawaii Rules of Civil Procedure (1981), determination that there was no just reason for delay and directed entry of a final judgment.

[7] Our reversal of the trial court on the issue of equitable subordination renders moot the issues on appeal regarding the attorney's fees and costs awarded to Pac Loan.

## A. *Standard of Review*

Here, we are asked to review the trial court's conclusions of law. An appellate court may freely review legal conclusions and the applicable standard of review is the right/wrong test. *See* 9 C. Wright & A. Miller, Federal Practice and Procedure: *Civil* § 2588 (1971); *Molokoa Village Development Co. v. Kauai Electric Co. Ltd.*, 60 Haw. 582, 593 P.2d 375 (1979); *Block v. Lea*, 5 Haw. App. 266, 688 P.2d 724 (1984).

Pac Loan claims that, since an equitable remedy decreed by the trial court is at issue, the applicable standard of review is abuse of discretion. We disagree. Before we can reach the issue of discretion, we must decide whether, legally, the doctrine of equitable subordination is properly applicable outside the bankruptcy context. If deemed applicable, we must then decide whether, based on its findings of fact, the trial court correctly concluded that the application of the doctrine was proper.

### B. *The Applicability of the Doctrine of Equitable Subordination in Non-Bankruptcy Cases*

The doctrine of equitable subordination permits a bankruptcy court, under its general equity power, "to subordinate a creditor's claim to other claims or classes toward which the creditor has behaved unfairly." Cohn, *Subordinated Claims: Their Classification and Voting Under Chapter 11 of the Bankruptcy Code*, 56 Am. Bankr. L.J. 293, 300 (1982). Its development has been through case law which has been codified in Section 510(c) of the Bankruptcy Code of 1978, 11 U.S.C. § 510(c) (1982).[8] *See* 3 Collier on Bankruptcy ¶ 510.05 (15th ed. 1984).

---

[8] 11 U.S.C. § 510(c) (1982) reads as follows:

(c) Nothwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may —

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

PSLIC doubts "the propriety of applying equitable subordination in a non-bankruptcy action." We join in the doubt.

As contrasted with other litigation, the following unique features are involved in bankruptcy proceedings where the doctrine of equitable subordination is invoked.

First, equitable subordination is involved in a liquidation or reorganization proceeding where all of the debtor's assets, less exemptions, if any, are available for distribution or allocation to all of the debtor's creditors with allowable claims upon proper notice.

Second, the proper party to seek equitable subordination is the trustee, as the representative of the creditors, not the debtor who has no standing in that regard. *In re Weeks,* 28 B.R. 958 (Bankr. W.D. Okla 1983); *In re Lockwood,* 14 B.R. 374 (Bankr. E.D. N.Y. 1981).

Third, where the doctrine of equitable subordination is applied, the claimant's misconduct was directed against or inflicted upon the debtor, not a creditor. *See, e.g., Comstock v. Group of Institutional Investors,* 335 U.S. 211, 68 S. Ct. 1454, 92 L.Ed. 1911 (1948); *Pepper v. Litton,* 308 U.S. 295, 60 S. Ct. 238, 84 L.Ed. 281 (1939); *Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 59 S. Ct. 543, 83 L.Ed. 669 (1939).

The above features are not present in the instant case. Here, we deal with a mortgage foreclosure case involving only the Banyan Property of the Hos. Neither are all of the Hos' assets involved in the litigation nor are all of the Hos' creditors in court. The purported inequitable acts or omissions of PSLIC were directed at or inflicted upon Pac Loan, another creditor, and not the Hos, the debtors. There is no trustee or receiver seeking equitable subordination of PSLIC's lien.

Neither Pac Loan nor PSLIC has located any reported non-bankruptcy case in which the doctrine of equitable subordination was applied. Our research disclosed a case in which a holder of maritime liens sought to equitably subordinate the lien of a vessel's mortgagee.[9] *West of England Ship Owners Mutual Protection & Indem-*

---

[9] We are aware of receivership cases wherein preferences may be accorded certain claims. *See Unna v. Brown,* 6 Haw. 676, *aff'd,* 7 Haw. 190 (1887). *See also Lewis & Dalin v. E.H. Clarke Lumber Co.,* 185 Or. 522, 204 P.2d 130 (1949).

*nity Ass'n v. Patriarch Steamship Co.,* 491 F. Supp. 539 (D. Mass. 1980). Based on the facts in the case, however, the court found no basis for equitable subordination. Since the maritime lienholder alleged false or misleading representation made by the mortgagee to the lienholder's detriment, we believe that the pertinent doctrine was equitable estoppel,[10] rather than equitable subordination.

Thus, we are dubious of the applicability of the equitable subordination doctrine in this mortgage foreclosure case. However, inasmuch as *West of England* suggests that equitable subordination is applicable in a non-bankruptcy context, we will discuss the trial court's application of the doctrine in this case.

### C. *The Doctrine and the Mobile Test*

The Court of Appeals for the Fifth Circuit has formulated the following three-pronged test which must be satisfied before the bankruptcy court may exercise its power of equitable subordination:[11]

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir. 1977) (citations omitted).

### 1. The First Prong

The types of inequitable conduct which would satisfy the first prong of the *Mobile* test have been classified into three categories by a legal writer: first, "fraud, illegality, breach of fiduciary relation-

---

[10] *See* note 14, *infra.*

[11] It may be noted that the trustee has authority to avoid or disallow fraudulent transfers or obligations under sections 544(b)(11) U.S.C. § 544(b) and 548(a) (11 U.S.C. § 548(a)) of the Bankruptcy Code. *See* Levin, *An Introduction to the Trustee's Avoiding Powers,* 53 Am. Bankr. L.J. 173 (1979).

ship or other blatant wrongdoing"; second, "undercapitalization"; and third, that "a claimant has controlled the debtor as to make it a mere instrumentality of the claimant, to the debtor's detriment." Cohn, *supra,* at 300-01.

The types of inequitable conduct under the first category include (1) the dominant stockholder's misuse of a judgment claim against the debtor to the detriment of other creditors condemned in the landmark case of *Pepper v. Litton, supra;* (2) the creditor's participation in a conspiracy to restrain and monopolize interstate trade and commerce in natural gas and the acquisition of the claims against debtors under reorganization "pursuant to and in accomplishment of the aims and purposes of that conspiracy" involved in *Columbia Gas & Electric Corp. v. United States,* 151 F.2d 461, 466 (6th Cir. 1945), *modification denied,* 153 F.2d 101 (1946); and (3) breaches of fiduciary relationship found in the activities by officers, directors, and controlling stockholders asserting claims against debtor-corporations as in *Pepper v. Litton, supra* (controlling stockholder); *Boyum v. Johnson,* 127 F.2d 491 (8th Cir. 1942) (controlling stockholder and managing officer); and *In re Dean and Jean Fashions, Inc.,* 329 F. Supp. 663 (W.D. Okla. 1971) (sole stockholders and directors).

A typical example of the second category of misconduct as grounds for equitable subordination is *Costello v. Fazio,* 256 F.2d 903 (9th Cir. 1958). In *Costello,* in incorporating a partnership, two partners who were to become officers, directors, and controlling stockholders converted the bulk of their capital contributions in the partnership into loans by taking promissory notes, and left the partnership and succeeding corporation grossly undercapitalized, to the detriment of the corporation and its creditors. The former partners' claims based on the promissory notes against the bankrupt corporation were equitably subordinated. In undercapitalization cases, the test is whether the claim, in economic and legal reality, is an indebtedness or a proprietary interest. If it is the latter and there is detriment to other creditors, equitable subordination will be imposed. *See* Herzog & Zweibel, *The Equitable Subordination of Claims in Bankruptcy,* 15 Vand. L. Rev. 83, 93-98 (1961). *See also In re N.A.B. Food Services, Inc.,* 32 B.R. 128 (Bankr. S.D. Ohio 1983).

The third category of inequitable conduct generally occurs in cases where the debt is owed by a bankrupt corporation to its par-

ent or affiliated corporation, or to its controlling stockholder or stockholders. *See* Herzog & Zweibel, *supra,* at 102-12. Here, the court applies equitable principles to disregard the separate corporate entity of the debtor-corporation and treat it as a mere instrumentality or alter ego of the creditor who is its parent or affiliated corporation or its controlling stockholder or stockholders. Thus, in *Taylor v. Standard Gas & Electric Co., supra,* 306 U.S. at 322, 59 S. Ct. at 550, 83 L.Ed. at 676, the Supreme Court stated that the "instrumentality rule" is "the application in particular circumstances of the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice." In its analysis of *Taylor,* the Supreme Court stated in *Pepper v. Litton, supra,* 308 U.S. at 308, 60 S. Ct. at 246, 84 L.Ed. at 290, that there was a "history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary by Standard to the detriment of the public investors." Despite the domination of the subsidiary corporation by the parent, however, equitable subordination is inapplicable if the facts reveal "good faith, fair dealing and freedom from fraud or overreaching" by the parent. *Comstock v. Group of Institutional Investors, supra,* 335 U.S. at 230, 68 S. Ct. at 1464, 92 L.Ed. at 1923.

### 2. The Second Prong

The second prong of the *Mobile* test requires that the inequitable conduct must have caused injury to the bankrupt's creditors or resulted in an unfair advantage to the claimant. *See In re Multiponics, Inc.,* 622 F.2d 709 (5th Cir. 1980). If no creditor is injured by the purported misconduct of the claimant, equitable subordination will not be ordered. *See In re Monex Corp.,* 32 B.R. 82 (Bankr. S.D. Fla. 1983).

### 3. The Third Prong

The third prong of the test is self-explanatory. For example, a bankruptcy court may not equitably subordinate administrative rents which have a statutory first priority under the bankruptcy code. *In re Dade County Dairies, Inc.,* 474 F. Supp. 438 (S.D. Fla. 1979).

#### 4. Adequate Evidentiary Basis Requirement

The *Mobile* court stated that "an objection resting on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegations of impropriety." 563 F.2d at 701. In a bankruptcy case, the trustee must establish an adequate evidentiary basis for equitable subordination and there must be sufficient findings of fact corresponding to each of the *Mobile's* three-pronged test components. *In re Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206 (5th Cir. 1983).

### D. *The Inequitable Conduct*

The trial court concluded that the conduct of Parent Company, Fickle, Gamble, and Matsukage was inequitable and, consequently, applied the doctrine to equitably subordinate PSLICMortgage lien. We will thus closely study the court's findings to determine what constituted the "inequitable conduct."

We note initially that the document filed as the December 30, 1982 Findings and Conclusions is the actual proposed findings and conclusions submitted by Pac Loan's attorney, as edited by the trial court. The trial court made handwritten substitutions, additions, and deletions on the proposed findings and conclusions and initialed each of the substitutions, additions, and deletions. We further note that Pac Loan did not appeal any of the substitutions, additions, and deletions made by the trial court.

#### 1. Interlocking Directors

The trial court found "interlocking directors" among Parent Company and its subsidiaries, which is not unusual. The court further found that after the acquisition of Pac Loan by the Matsukages on September 29, 1975, both Pac Loan and Matsukage were "substantially influenced by Parent Company" through Gamble and Fickle. *See* findings nos. 44 and 45.

However, "mere control or domination of a corporation is not proscribed by law and is in itself insufficient to justify piercing the corporate veil and subordinating claims." *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389, 393 (10th Cir. 1979) (quoting Herzog

& Zweibel, *supra*, at 112). *See also In re Featherworks Corp.*, 25 B.R. 634 (Bankr. E.D. N.Y. 1982).

### 2. Kailua Village

Findings nos. 27 through 38 deal with the 64-unit Kailua Village condominium apartment complex constructed by Aloha Development in 1972-73 for which PSLIC had made the construction loan. In May 1973, Aloha Development ceased marketing the units because of the Securities and Exchange Commission's inquiries concerning Aloha Development's marketing practices.

In December 1973, PSLIC made a $2,250,000 mortgage loan to the Hos for their purchase of Kailua Village from Aloha Development who used the $2,250,000 to repay to PSLIC the construction loan. REFC borrowed $1,092,450 from PSLIC and purchased 34 of the 64 units from the Hos. The Hos retained some of the remaining 30 units and disposed of some to their friends and relatives.

On December 14, 1973, Pac Loan made a $104,450 loan to the Hos (Loan 364) which was secured by a second mortgage on six of the Kailua Village units. Later in 1976, Pac Loan purchased the six units by way of assumption of the PSLIC's first mortgage. However, "Pac Loan generated profit from the ultimate sale of these units." Finding no. 35.

Pac Loan sought to prove by the various Kailua Village transactions that Parent Company, through Gamble and Fickle and the use of James Ho, manipulated REFC and Pac Loan for the benefit of PSLIC and Aloha Development. However, the trial court deleted proposed findings nos. 34, 37, and 38 and thereby refused to find that (1) the granting of Loan 364 to the Hos was "part of an unlawful and fraudulent plan, conspiracy and scheme among Gamble, Fickle, Matsukage, PSLIC, and Parent Company" (proposed finding no. 34), (2) "the sham sale of Kailua Village Units to James G.Y. Ho was part of an unlawful and fraudulent plan, conspiracy and scheme which resulted in detriment to Pac Loan" (proposed finding no. 37), and (3) "Gamble exercised control over Pac Loan during all relevant times herein" (proposed finding no. 38). The trial court's refusal to make those findings requested by Pac Loan is regarded on appeal as findings that Pac Loan failed to meet

its burden of proof on those issues. *See Hammond v. Reeves,* 89 N.M. 389, 552 P.2d 1237 (1976); *Worthey v. Sedillo Title Guaranty, Inc.,* 85 N.M. 339, 512 P.2d 667 (1973); *Gallegos v. War,* 78 N.M. 796, 438 P.2d 636 (1968).

The Kailua Village transactions predated and had no connection with Pac Loan's Loans 550 and 598 to the Hos. Moreover, the trial court refused to find any "fraudulent plan, conspiracy and scheme" regarding Kailua Village. Under the circumstances, there is no "inequitable conduct" imposable or imputable on PSLIC based on the Kailua Village transaction.

### 3. Loans 550 and 598

When Pac Loan made Loans 550 and 598 to the Hos, it was no longer a subsidiary of Parent Company. As Parent Company nominees, Gamble and Fickle sat on Pac Loan's board with Matsukage and another director. Gamble and Fickle did not control the board.[12]

Pac Loan sought to show that Loans 550 and 598 were bad loans which should never have been made, that no effort had been exerted to collect the delinquent loans due from the Hos, and that Gamble and Fickle, as directors, were chargeable with misfeasance or nonfeasance which were imputable to Parent Company, and, in turn, attributable to PSLIC.

The trial court did find that the Hos had delinquent loans totaling $148,111 with Pac Loan when Loan 550 was made and delinquent loans totaling $197,850 when Loan 598 was made. The court, however, found that the loan committee which approved Loan 550 did not include Gamble and Fickle.[13] Moreover, the record indicates that neither Loan 550 nor Loan 598 was submitted to the board of directors for approval.

---

[12] Pac Loan made Loan 550 to the Hos on October 1, 1975, just two days after the Matsukages acquired ownership of Pac Loan on September 29, 1975. However, Matsukage had been the president of Pac Loan since 1971 and James Ho testified that "[t]he only person [he] discussed [the loans] with was Mr. Matsukage." Transcript, Vol. II at 472.

[13] Matsukage was a member of the loan committee. Although the trial court made no finding, the record discloses that the loan committee which approved Loan 598 did not include Gamble and Fickle.

What is significant is not so much what the trial court found, but what it refused to find. It refused to make findings of fact nos. 53, 54, 55, 57, 59, 62, 63, 64, 65, and 66 proposed by Pac Loan which state in relevant part:

53. Fickle and Gamble knew about HOs' delinquencies at Pac Loan at the time loan [550] was made.

54. James G.Y. Ho did not intend to pay Pac Loan for Loan [550] . . . because [the loan was] part of the consideration for the HOs participation in . . . as James G.Y. Ho called the Kailua Village transfers . . . "paper transactions."

55. Loan [550 was] not made upon consideration which a reasonable person engaged in the industrial loan industry would make[.]

57. Under the circumstances, loan [598] was not one which a reasonable prudent lender in the industrial loan industry would have made.

59. [Loans 550 and 598] to HOs, were made through the exercises of the control position of Parent Company, through the actions of its agents, Fickle and Gamble, and through the exercise of the control over Matsukage.

62. While Parent Company and Matsukage were shareholders of Pac Loan, Parent Company, its agents Fickle and Gamble, and its controlled entity Matsukage owed a fiduciary duty to Pac Loan to restrict Pac Loan from making loans that did not have a reasonable likelihood of being repaid. Parent Company, Gamble, Fickle and Matsukage, acting to benefit PSLIC directly and to benefit themselves indirectly, breached [sic] this fiduciary duty at least with respect to making of [Loans 550 and 598] under the circumstances stated above.

63. While Parent Company and Matsukage were shareholders of Pac Loan, Parent Company, its agents Fickle and Gamble and its controlled entity, Matsukage, owed a fiduciary duty to Pac Loan to take reasonable measures to cause amounts owed to Pac Loan on loans made by Pac Loan to be collected when these loans became due and payable. Parent Company, Gamble, Fickle and Matsukage, acting to benefit PSLIC directly and to benefit themselves indirectly, breached [sic] this fiduciary duty at least with respect to [Loan 550 and 598] by failing to take reasonable measures to cause amounts owed to

Pac Loan to be collected at the time the debts became due and payable.

64. While Parent Company and Matsukage were share-holders of Pac Loan, Parent Company, its agents Fickle and Gamble and its controlled entity, Matsukage, owed a fiduciary duty to Pac Loan to take reasonable measures to cause diligent collection efforts to be made to recover amounts owed to Pac Loan on loans which had matured and were overdue or which had delinquent installment payments. Parent Company, its agents Fickle and Gamble and its controlled entity, Matsukage, acting to benefit PSLIC directly and to benefit themselves indirectly, breached this fiduciary duty to Pac Loan by failing to take reasonable measures to cause diligent collection efforts to be made to recover amounts owed to Pac Loan on loans which had matured and were overdue or which had delinquent installment payments overdue.

65. Gamble, Fickle and Matsukage as Directors of Pac Loan owed a fiduciary [duty] to Pac Loan to disclose material information to Pac Loan to include their interests in and obligations to PSLIC and Parent Company and the information they knew or should have known about the credit worthiness of James G.Y. Ho. Gamble, Fickle and Matsukage, acting to benefit PSLIC directly and to benefit themselves indirectly, failed to make these disclosures. As a direct and proximate result of the lack of these disclosures [Loans 550 and 598] were made. Had a reasonable prudent lender in the industrial loan industry had access to this information which Gamble, Fickle and Matsukage failed to disclose, [Loans 550 and 598] would not have been made by the said reasonable prudent lender.

66. These breaches of fiduciary duty have resulted in detriment to Pac Loan in that these breaches resulted in Pac Loan holding worthless notes and mortgage [sic] in [Loan 550 and 598].

As indicated above, we regard the trial court's refusal to make those findings requested by Pac Loan to be findings that Pac Loan failed to meet its burden of proving those factual issues.

Our foregoing analysis of the trial court's findings and of its refusal to make certain requested findings inexorably leads us to a determination that based on its findings of fact, the trial court

erred in concluding that the conduct of Parent Company, Gamble, Fickle, and Matsukage, imputable to PSLIC, was "inequitable." Consequently, we hold that conclusions of law nos. 10, 11 and 12 are erroneous and the trial court should not have equitably subordinated PSLIC's Mortgage lien.[14]

### III. PAC LOAN'S CROSS-APPEAL

Pac Loan contends that the trial court erred in amending the May 4, 1982 Judgment by reducing the total judgment against the Hos of $227,628.48 to $128,247.33 by entry of its December 22, 1982 Amended Judgment.[15] For the reasons stated below, we vacate the December 22, 1982 Amended Judgment and reinstate the May 4, 1982 Judgment.

The $227,628.48 May 4, 1982 Judgment in favor of Pac Loan was against the Hos and not PSLIC. The Hos themselves never sought to have the May 4, 1982 Judgment amended or modified. It was PSLIC who sought relief from the May 4, 1982 Judgment.

The judgment debtor is ordinarily the person entitled to the opening, modification, or vacation of a judgment. 46 Am. Jur. 2d *Judgments* § 691 (1969). The general rule is that a third person has no standing to modify or vacate a judgment unless it purports to bind him under the doctrine of *res judicata* or he has an interest affected by the judgment. *Id.* at § 694; Restatement (Second) of Judgments § 64 (1982).

---

[14] The doctrine of equitable estoppel is applicable to subordinate a mortgage lien where a subsequent lienor detrimentally relied on the representation or conduct of the mortgagee sought to be estopped and such reliance was reasonable under the circumstances. *See Strouss v. Simmons,* 66 Haw. 32, 657 P.2d 1004 (1982); *Apex Siding & Roofing Co. v. First Federal Savings & Loan Ass'n,* 301 P.2d 352 (Okla. 1956). Since there is no finding of detrimental reliance by Pac Loan nor any finding of misrepresentation or misleading conduct by PSLIC or its agents, Pac Loan cannot prevail on grounds of equitable estoppel either.

[15] The December 22, 1982 Amended Judgment reduced the original judgment amount of $227,628.48 by (1) recognizing and applying a credit of $38,423.98 on Loan 550 as of April 1, 1978, (2) accruing interest on Loan 550 only from and after April 1, 1978, and (3) applying interest at a rate of 12% per annum after the maturity dates of Loans 550 and 598 instead of 15% and 18%, respectively.

In moving for relief, PSLIC was aware that the amount of Pac Loan's judgment against the Hos would affect PSLIC's interest only if the court ordered the equitable subordination of PSLIC Mortgage lien to Pac Loan's mortgage liens. If the court's priorities ruling favored PSLIC, the issue regarding the judgment amount would be moot insofar as PSLIC was concerned. At the hearing on PSLIC's motion, the court stated that "the amount [of the judgment] obviously would affect [PSLIC] if [PSLIC] comes in second on the equitable subordination priority claim [of Pac Loan]."[16] Transcript of May 21, 1982 Proceedings at 58.

Based on the foregoing circumstances, the trial court entered its December 22, 1982 Amended Judgment only because it had determined to equitably subordinate PSLIC Mortgage lien. If it had determined to uphold the priority of PSLIC Mortgage lien, the court undoubtedly would have denied PSLIC's motion for relief and left the May 4, 1982 Judgment intact.

Since we are reversing the trial court on the PSLIC Mortgage lien subordination issue, we are constrained to strike the December 22, 1982 Amended Judgment and leave the May 4, 1982 Judgment unmodified.

In its cross-appeal, Pac Loan also contends that the trial court erred (1) in denying its "Motion to Amend Pleadings to Conform to the Evidence"[17] and (2) in failing to enforce a stipulation regarding the payment by PSLIC of Pac Loan's lien amounts upon the entry of a judgment subordinating PSLIC Mortgage lien. The first contention is without merit and the second contention is rendered moot by our ruling on PSLIC's appeal.

### IV. CONCLUSIONS

Accordingly, we reverse the trial court's decisions which equitably subordinate PSLIC's Mortgage lien and which modify the May

---

[16] At the hearing, PSLIC's attorney stated, "If you do not rule against us, I don't care about [amending the May 4, 1982 Judgment]," and "[I]f you rule for us, this is an academic exercise." Transcript of May 21, 1982 Proceedings at 53, 55.

[17] This motion was filed on March 4, 1983, after the trial court entered its findings of fact and conclusions of law on the priorities issue on December 30, 1982.

4, 1982 Judgment in favor of Pac Loan and against the Hos and direct the trial court to:

1. Vacate the "Final Judgment in Favor of Pacific Loan, Inc." filed on June 2, 1983;

2. Vacate the "Amended Judgment" in favor of Pac Loan and against the Hos filed on December 22, 1982, and reinstate the "Judgment" in favor of Pac Loan and against the Hos filed on May 4, 1982; and

3. Enter an appropriate judgment according PSLIC Mortgage lien priority over Pac Loan's mortgage liens.

Remanded for further proceedings consistent with this opinion.

*John Jubinsky* (*Paul S. Aoki* and *Trudy K. Senda* with him on the briefs; *Ashford & Wriston,* of counsel) for defendant-appellant and cross-appellee.

*Glenn S. Hara* (*Roy Y. Yempuku* with him on the briefs) for defendant-appellee and cross-appellant.