722 P.2d 1062

W. Baxter BROWN and Linda Lee Brown, husband and wife, Plaintiffs-Appellants-Cross Respondents,

v.

YACHT CLUB OF COEUR D'ALENE, LTD., a partnership; Wesley R. Hamilton and Doris Hamilton, husband and wife, Sally Ann Hall Ericksen and Raymon Ericksen, husband and wife, Mark E. Hall and Ann Hall, husband and wife, and Robert A. Hall, a single person, partners; and Yacht Club of Coeur D'Alene, Inc., an Idaho Corporation, Defendants-Respondents-Cross Appellants.

No. 15606.

Court of Appeals of Idaho.

May 30, 1986.

Sidney E. Smith (Smith and Hosack), Coeur d'Alene, together with Diane M. Hermanson and Dan E. McKelvey, Jr., (argued), Spokane, Wash., for plaintiffs-appellants-cross respondents.

Thomas A. Mitchell, (argued), Coeur d'Alene, and John Thomas Mitchell, Boise, for defendants-respondents-cross appellants.

BURNETT, Judge.

This appeal presents two questions. First, are buyers of real estate entitled to rescind the sale agreement when third-party communications reveal a cloud on the sellers' title? Second, if rescission is appropriate, may the buyers recover (a) profits they expected to realize from developing the property, (b) benefits allegedly bestowed upon the sellers before rescission, or (c) out-of-pocket expenses incurred while preparing to develop the land, in reliance on the sale agreement? The district court decided that rescission was proper but that the buyers were not entitled to recover in any of the categories indicated. Both sides have appealed. For reasons explained below, we affirm the district court's ruling on rescission, but we vacate that part of the judgment which precludes recovery of the buyers' out-of-pocket expenses.

These issues are framed by complex facts. Those essential to our opinion are summarized here. In late 1978, Baxter and Linda Lee Brown became interested in buying development property near Coeur d'Alene. Their attention was drawn to "Blackwell Island," a parcel on the Spokane River. The land was owned in part by the Yacht Club of Coeur d'Alene, Ltd., a partnership, and in part by the Yacht Club of Coeur d'Alene, Inc., a corporation. The Browns negotiated the purchase with J.E. Hall, president and principal stockholder of the Yacht Club corporation. Mr. Hall negotiated for the Yacht Club partnership as well, its partners consisting of Hall's children and a close business associate.

In 1980 the Browns agreed to purchase the property owned by the corporation and the partnership for a total price of three million dollars. Two virtually identical earnest money agreements were signed, one by the corporation and one by the partnership. Each agreement provided as follows:

The closing of this transaction shall be thirty (30) days after final zoning approval as a PUD [planned unit development] for the use of the property in accordance with the developmental plans of Purchaser has been obtained. Purchaser agrees to pursue in the most expeditious manner possible in a continuous and uninterrupted manner all steps, including various governmental agency approvals, necessary to obtain such zoning. The closing agent for this transaction will be the title company who furnishes title insurance on the property. Purchaser shall pay the closing costs and escrow fees.

\* \* \* \* \* \*

Executed concurrently herewith is a Promissory Note ... payable to Forrest Brown Realtors, Inc., to be transferred by the realty to the closing agent upon closing of this transaction. Should Purchaser fail to comply with the terms of this agreement and the attached Real Estate Contract, then the earnest money will be forfeited and retained by Seller. Purchaser will pay any real estate commissions involved in this transaction.

The promissory note accompanying the corporation's agreement was for $1,000; the note accompanying the partnership's agreement was for $9,000. The sale was contingent upon issuance of the necessary development permits by government agencies.

The buyers then hired consultants, prepared a development scheme comprised of commercial and residential uses, and sought approval from the pertinent government agencies. The buyers secured necessary zoning changes and tentative approval of the proposed PUD, subject to obtaining a permit for dredging operations contemplated by the development plan. The dredging permit was withheld, pending an engineering study of possible damage to Lake Coeur d'Alene and the underlying aquifer. Before the study could be completed and the dredging permit obtained, controversy erupted over an apparent cloud upon title to the property.

The earnest money agreements obligated the corporation and the partnership to convey "marketable" and "insurable" title. When the agreements were executed in

1980, the buyers were aware that Mr. Hall might have outstanding tax liabilities. In response to an inquiry from the buyers, Hall replied, "Don't go poking around on these tax problems, or we will just call the whole deal off." Nevertheless, the buyers proceeded with the transaction because Hall personally was not a record owner of "Blackwell Island" and because a preliminary title report disclosed no tax liens.

However, in late 1980, judgments were entered by a federal district court against J.E. Hall and James Emery Hall Contractors, Inc., for tax deficiencies totaling approximately two million dollars. Soon thereafter an article appeared in the Coeur d'Alene newspaper discussing the sale and development of "Blackwell Island." A local agent of the Internal Revenue Service saw the article and contacted Mr. Brown. The agent claimed that "Blackwell Island" was "pledged" to the IRS. Brown then spoke with an attorney at the U.S. Department of Justice. The attorney reiterated that a "pledge" existed, asserted that Hall had dealt with corporate and partnership assets as though they belonged to him personally, and advised Brown to proceed cautiously.

An updated title search failed to disclose the "pledge," but a title officer told Brown that IRS encumbrances were not always recorded. The IRS declined to furnish a copy of the "pledge" instrument. When asked, Hall refused as well. Hall insisted that the "pledge" did not affect "Blackwell Island." When the PUD proposal received tentative approval, Hall requested an early closing of the transaction, despite the lack of a dredging permit. When Brown inquired as to the reason for this request, Hall replied simply, "It is [to] your and my benefit to close early." The Browns then sued for rescission.

Following a bench trial, the district court found the facts recited above. The court concluded that the sellers had committed an anticipatory breach of the earnest money agreements by requesting that the transaction be closed when marketable and insurable title apparently could not be provided. The district judge characterized the breach as "substantial and fundamental." He allowed the buyers to rescind and he ordered cancellation of the promissory notes that had accompanied the earnest money agreements. No further relief was granted. These appeals followed.

## I

We first consider the propriety of granting rescission for the asserted cloud on title. The evidence at trial disclosed that the mysterious "pledge" did in fact exist. It was an instrument that "irrevocably assigned, transferred and pledged" to the IRS all shares owned in Yacht Club, Inc. As amended, the instrument also prohibited "the assets of the Yacht Club of Coeur d'Alene, including the assets to be acquired by that corporation ... [to] be transferred, sold, or encumbered without permission in writing from the District Director." The instrument did not refer to the Yacht Club partnership. However, the IRS maintained that the "pledge" applied to Hall's entire interest in "Blackwell Island," including that which he held and wielded indirectly through the family partnership. The trial court received evidence that on other occasions Hall had executed instruments creating easements across the portion of "Blackwell Island" owned by the partnership.

The sellers now contend, as they did at trial, that despite such evidence and IRS assertions, the "pledge" did not legally encumber the real property at "Blackwell Island." They further contend that even if an encumbrance existed, it pertained only to the corporation's land (a small fraction of the whole) and, in any event, that the buyers would have been protected by an "extended coverage" title insurance policy as provided in the earnest money agreements. We disagree.

"A purchaser of real property who bargained for marketable title thereto cannot be required to accept property with an admitted cloud on the title." *Fajen v. Powlus*, 98 Idaho 246, 248, 561 P.2d 388, 390 (1977). Marketable title is defined as "one free and clear of all encumbrances."

*Metzker v. Lowther*, 69 Idaho 155, 166, 204 P.2d 1025, 1033 (1949). A marketable title is "one as free from *apparent* defects as from actual defects, one in which there is no doubt involved either as a matter of law or fact. Every title is doubtful which invites or exposes the party holding it to litigation." *Bell v. Stadler*, 31 Idaho 568, 572, 174 P. 129, 131 (1918) (emphasis added).

■ Although the language quoted from *Bell* suggests that "no doubt" may exist as to title, the widely accepted—and more practical—rule has long been that marketable title must be free from *reasonable* doubt. *E.g., Eggers v. Busch*, 154 Ill. 604, 39 N.E. 619 (1895); *Howe v. Coates*, 97 Minn. 385, 107 N.W. 397 (1906); *Moore v. Williams*, 115 N.Y. 586, 22 N.E. 233 (1889); *Herman v. Somers*, 158 Pa. 424, 27 A. 1050 (1893). Moreover, the test is not whether title ultimately might be adjudged free of defects. Rather, it is "whether a reasonably prudent [person], familiar with the facts and apprised of the question of law involved, would accept the title in the ordinary course of business." 77 AM. JUR. 2D *Vendor and Purchaser* § 132, at 316 (1975).

■ Applying this test to a fact pattern creates a mixed issue of law and fact. Under the standard of clear error established by Rule 52(a), I.R.C.P., we defer to factual findings by the district judge. We freely review conclusions of law drawn by applying legal principles to those facts. *E.g., Kipahulu Investment Co. v. Seltzer Partnership*, 4 Haw.App. 625, 675 P.2d 778 (1983). Here, we agree with the judge's conclusion that title was not marketable. In light of the "pledge," which Hall barred Brown from examining at times critical to this case, and in light of the warning issued by the attorney at the Department of Justice, we believe that no reasonable and prudent business person would have closed the transaction and accepted title. The threat of litigation was imminent. As noted in *Bell*, a buyer is not required to purchase a lawsuit. We further believe that reasonable doubt concerning the title pervaded the entire transaction, not merely that portion of it relating to the corporation's land.

Finally, we agree with the district court that the cloud on title was not dissipated by the availability of "extended coverage" title insurance. Even if we assume, for the sake of discussion, that such insurance would cover the kind of potential claim indicated here, the fact remains that insurable title is not a substitute for marketable title. *See generally* 7 R. POWELL, POWELL ON REAL PROPERTY ¶ 1044 (1984). Insurable title merely means that property is capable of being insured, not that the title is good or marketable. *Hebb v. Severson*, 32 Wash.2d 159, 201 P.2d 156 (1948). Conversely, a title may be marketable, but not insurable. The earnest money agreement in this case required both, not one or the other. We conclude that the district court correctly held the earnest money agreements to have been breached, allowing rescission.

## II

We now turn to the question whether the buyers were entitled to compensation in addition to rescission. As noted, the district court held that the buyers were entitled to nothing more than cancellation of the promissory notes. However, in general, when a contract has been breached, the aggrieved party may seek compensation for infringement upon any of three separate interests embodied in the contract.

> Judicial remedies ... serve to protect one or more of the following interests of [one who has been promised performance under a contract]:
>
> (a) his "expectation interest," which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed,
>
> (b) his "reliance interest," which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made, or

(c) his "restitution interest," which is his interest in having restored to him any benefit that he has conferred on the other party.

RESTATEMENT (SECOND) OF CONTRACTS § 344 (1979) (herein cited as the *Second Restatement*). We will consider each of these interests, as applied to the instant case.

■ The expectation interest—the benefit of the bargain—has divided the courts in cases where sellers of real estate fail to deliver marketable title.

> Where the vendor breaches his contract to convey land to the purchaser, the purchaser's normal damages remedy gives him his loss of bargain.... Some states, however, limit recovery to a restoration of any sum paid on the purchase price when the vendor's breach is not willful and results only from an unintended failure of title.

D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 12.7, at 832 (1973). But in the present case, we need not decide whether Idaho is among the states so limiting recovery. In our view, the claim of an expectancy interest in full performance of a contract is fundamentally inconsistent with a claim, made by the buyers here, for rescission of the contract. "Rescission is an equitable remedy that totally abrogates the contract and seeks to restore the parties to their original positions. * * * [One who seeks rescission] no longer treat[s] the contract as in existence." *Blinzler v. Andrews,* 94 Idaho 215, 218, 485 P.2d 957, 960 (1971), *disapproved on other grounds, Bernard & Son, Inc. v. Akins,* 109 Idaho 466, 708 P.2d 871 (1985). Consequently, we concur with the district court that compensation for the expectancy interest would have been inappropriate in this case.

The remaining interests—"reliance" and "restitutionary"—present a terminology problem. In some cases and texts, the term "restitution" is broadly used to denote compensation for both of these interests. It may refer to restoring the pre-contract status quo or to recovering the value of benefits bestowed upon the other party.

*See generally* G. DOUTHWAITE, ATTORNEY'S GUIDE TO RESTITUTION § 8.1 (1977).

■ Nevertheless, we will consider each interest separately. The restitution interest, as envisioned by the *Second Restatement,* seeks recovery of the value of benefits bestowed, and which it would be unjust for the other party to retain. This form of recovery is available for breach of a contract. As noted in *McEnroe v. Morgan,* 106 Idaho 326, 678 P.2d 595 (Ct.App. 1984), an aggrieved purchaser may "elect to rescind a land sale contract and seek restitution of the benefits he has conferred on the seller if the seller has materially breached the contract." *Id.* at 329, 678 P.2d at 598. However, the benefits must be real, not speculative; and they must actually have been conferred upon the breaching party. *Second Restatement* § 370. If it is determined that benefits actually were bestowed, other elements of the unjust enrichment doctrine must be satisfied. The value of the benefits must be realized by the breaching party under circumstances where it would be inequitable to avoid payment. *E.g., Mountain Medical, Inc. v. City of Colorado Springs,* 43 Colo.App. 391, 608 P.2d 821 (1979). Moreover, recovery for unjust enrichment is unavailable if the benefits are created incidentally by a party pursuing his own advantage. *E.g., Fowler v. Taylor,* 554 P.2d 205 (Utah 1976).

■ In this case, the district court found that the alleged benefits—the procurement of governmental permits and the preparation of a development scheme—were merely of speculative value to the sellers. There was no cogent showing that the sellers would or could avail themselves of such benefits. The court further found that the monetary value of such benefits was not adequately established. In this regard, the district court evidently discounted the testimony of an expert witness who purported to place a dollar figure upon the increased value of the land due to the acquisition of permits. It is the province of the trier of fact to determine the weight to be ascribed

to expert testimony. The court's findings that the supposed benefits were not actually bestowed or realized by the sellers, and that the pecuniary value of any benefits had not been satisfactorily established, are not clearly erroneous and will not be set aside.

■ Finally, we consider the "reliance" interest—the claim for recovery of out-of-pocket expenses incurred in anticipation of mutual performance of the contract. Compensation of this interest customarily is available when a contract has been breached, even if the aggrieved party elects to rescind the contract. *E.g., Blinzler v. Andrews, supra; Huggins v. Green Top Dairy Farms,* 75 Idaho 436, 273 P.2d 399 (1954); *Dursteler v. Dursteler,* 108 Idaho 230, 697 P.2d 1244 (Ct.App.1985). *Cf. French v. Nabob Silver-Lead Co.,* 82 Idaho 120, 350 P.2d 206 (1960) (holding that damages for breach of contract may include expenses incurred by a party in anticipation of or preparation for performance).

Here, the buyers presented undisputed evidence that they had expended some $303,000. Whether the entire amount is compensable may be doubtful, but the district court wholly rejected any compensation for the reliance interest. The court said that the buyers' obtaining of permits, preparation of the development plan, etc., were not "in furtherance" of the contract but were in furtherance of the buyers' own objectives. We believe this reasoning reflects an unduly narrow reading of the case law allowing recovery for the "reliance" interest. Such recovery is available for all expenses reasonably related to the purposes of the contract, which would not have been incurred but for the contract's existence. The district court, by focusing on the beneficiary of such services, may have confused the restitutionary interest—which is unavailable for services that primarily benefit the aggrieved party—with the "reliance" interest, which turns not upon the benefits but upon the relationship between the expenses and the purposes of the contract. In any event, we deem it clear that at least some of the expenses

incurred by the purchasers were for the mutual benefit of both parties because they shared a common interest in seeing the contract eventually performed.

We conclude that the district court erred by wholly rejecting the buyers' claim of compensation for their "reliance" interest in the contract. On remand, the district court should reexamine the evidence. The court should determine which expenses have been proven; of those, which would not have been incurred but for the existence of the contract; and of those, which were reasonably necessary to effectuate the purposes of the contract.

Accordingly, the judgment of the district court is affirmed as to the declaration of rescission. It is vacated with respect to the issue of monetary recovery. The case is remanded for further proceedings regarding compensation of the "reliance" interest, consistent with this opinion. Costs to the appellants, Brown. No attorney fees on appeal.

WALTERS, C.J., and SWANSTROM, J., concur.