747 P.2d 1302

William H. MURR and Marjorie Murr,
husband and wife,
Plaintiffs–Respondents,

v.

SELAG CORPORATION, a/k/a Selag
Development Co., a Delaware corpora-
tion, and Seafirst Mortgage Corpora-
tion, a corporation, Defendants–Appel-
lants,

and

Seafirst Mortgage Corporation, a
corporation, Third-party
Plaintiff–Appellant.

No. 16070.

Court of Appeals of Idaho.

Dec. 2, 1987.

Clemons, Cosho & Humphrey, Boise and Douglas J. Smart of Smith, Smart, Hancock & Tabler, Seattle, Wash., for defendants-appellants.

Jon J. Shindurling of May, May, Sudweeks, Shindurling & Stubbs, Twin Falls, for plaintiffs-respondents.

SWANSTROM, Judge.

Selag Corporation and Seafirst Mortgage Corporation bring this appeal from a district court judgment rescinding a land sale contract and awarding restitution and attorney fees to respondents, the Murrs. The principal questions we are asked to decide are: (1) whether the district court erred in holding that the purchasers of real estate had proven entitlement to rescission of the sale and restitutionary relief because of a mutual mistake and misrepresentation concerning the size of the parcel; (2) whether the court erred in holding that Seafirst, who was not a party to the sale, assumed joint liability with the seller for full restitutionary relief to the purchaser; and (3) whether the court erred in awarding attorney fees, costs and prejudgment interest against both Seafirst and the seller, Selag Corporation. For reasons set

forth in this opinion, we affirm in part, reverse in part and remand.

## I

In 1980 Selag acquired acreage known as Lot 1, Block 1, of LeBaron Estates in Blaine County. The same year, Selag's real estate brokers entered into negotiations with William and Marjorie Murr for sale of the property. The Murrs disclosed their intention to subdivide the tract into one acre lots for the construction of single family homes. Based on a plat recorded in 1973, the real estate agents told the Murrs that the property contained 5.64 acres and assured the Murrs that they could subdivide the property into five one-acre lots, the minimum lot size permitted in the area by local zoning laws. For this purpose, the Murrs determined that they could invest $21,000 per contemplated lot. Accordingly, after negotiations, the parties settled on a contract price of $105,000. Selag conveyed the property to the Murrs by warranty deed on October 9, 1980. The Murrs' payment consisted of cash; an assumption of two existing deeds of trust; and execution of a $48,000 note, secured by a third deed of trust in favor of Selag. A few months later, the Murrs were told by their own commissioned surveyor that the LeBaron Estates property had been erroneously surveyed and platted; that, as a result, the tract purchased by the Murrs encroached on the adjoining property and that the tract actually contained only 5.24 acres. According to the surveyor, this would not have been sufficient to accomodate five one-acre lots plus the necessary access road. The Murrs notified Selag of their intent to rescind and to obtain a refund of money paid. No settlement was reached and this suit followed.

The Murrs sued Selag, asking not for rescission but for damages or for a price reduction of at least $21,000. They later amended their complaint to add rescission to their request for relief. By a second amendment, over a year later, the Murrs added Seafirst as a defendant.[1] Seafirst became involved in this controversy through another unrelated, but equally unfortunate, venture by Selag.

In 1979 Selag had borrowed $1,400,000 from Seafirst to construct a condominium project in Blaine County. The project was not successful. Selag defaulted on its loan. Seafirst's security, the unsold condominium units, proved to be worth less than the unpaid loan balance. To avoid a foreclosure and to limit the personal liability of Fred Apsey, the principal owner of Selag, an agreement was reached among Seafirst, Selag and Apsey. The document needs to be mentioned only briefly here. We will simply note that, pursuant to the agreement, Selag transferred all of its assets, including the Murrs' $48,000 note and deed of trust to Seafirst, subject to certain pending third-party claims against Selag, Apsey or the transferred assets. The Murrs' action against Selag for misrepresenting the acreage of the LeBaron Estate property was one such claim. At that time, the Murrs had sued only Selag. Their complaint did not seek rescission, only damages or a reduction in the purchase price of the property.

The agreement among Seafirst, Apsey and Selag further provided for a "Claims Account," consisting of funds Seafirst had retained as part of its security for the $1,400,000 loan to Selag. The agreement stated that either Seafirst or Apsey would "handle" each of the claims so as to achieve an agreeable and reasonable settle-

---

1. The procedural history of the case is confusing due to the joinder and dismissal of numerous parties over a four-year period. *See, e.g., Murr v. Odmark,* 112 Idaho 606, 733 P.2d 827 (Ct.App.1987). Briefly, Leif and Judith Odmark, owners of property adjacent to the LeBaron property, were joined to determine whether their land encroached on the Murrs' land. Don-

ald and Barbara Aslett were joined as predecessors in interest and as senior lienholders. Alan Pennay and J.U.B. Engineers, Inc., the company which had prepared the LeBaron Estates plat, were also joined. Each of these parties was later granted a summary judgment of dismissal for reasons irrelevant to this appeal.

ment of each. We will discuss these critical features of the agreement later.

The Murrs' suit against Selag and Seafirst went to trial without a jury. The district court found that Selag's agents had misrepresented the acreage to the Murrs and that the parties had been mutually mistaken about the total acreage. The court found that the shortage prevented the property's subdivision into five one-acre lots, destroying the reason behind the purchase and requiring rescission and restitution. The court further found that, in the agreement mentioned above, Seafirst had assumed any liability Selag had toward the Murrs. The court ordered Seafirst and Selag to reimburse the Murrs for all payments, taxes and expenses incurred as a result of the sale, placing a constructive trust on the "Claims Account" for this purpose. Finally, the court awarded costs and attorney fees to the Murrs for the third-party claims and for the main suit, as consequential damages. Additionally, the court found that the main suit had been defended frivolously, unreasonably and without foundation by both Selag and Seafirst. Selag and Seafirst objected to the court's findings and conclusions and to the award of fees. They moved for a new trial. They received no relief and filed this appeal.

## II

■ At trial, the Murrs concentrated their efforts on proving their right to have the sale of the LeBaron tract rescinded. They did not pursue their earlier request for abatement of the purchase price as a possible remedy. They sought to prove that a reduction in the acreage from 5.64 acres to 5.24 acres destroyed their plans to subdivide the tract into five one-acre lots. Their position was that a half acre or more of the tract would be used to meet state highway access and county road requirements, leaving one or more of the proposed lots below minimum size. Selag and Seafirst contested the Murrs' assertion that the property could not be developed into five

lots. They pointed to the fact that the Murrs never submitted any formal application or proposed plat of a five-lot subdivision to the county planning and zoning commission for approval. Thus, they contend that the Murrs failed to prove, by competent and sufficient evidence, that a *five*-lot subdivision would not have been approved in spite of the slight reduction in acreage.

The Murrs called a professional engineer who was then the appointed engineer for Blaine County. The engineer had consulting experience with the planning and zoning commission and the county commissioners. A land planner—consultant, who had considerable experience in the county and who was a former planning and zoning commissioner, also testified for the Murrs. Based on his experience and knowledge, each expert testified, without objection, that a five-lot subdivision stood little chance of approval by the county. The engineer expressed the opinion that the discovered encroachment left the proposed five-lot subdivision "dead in the water." Both experts concluded that it would not be worthwhile for the Murrs to submit a formal application for a five-lot subdivision which would depend upon a deviation from strict access requirements. Selag and Seafirst then called the county planning director. While he indicated that access problems might be solved, he admitted that any application would probably not be approved until the encroachment was "cleared up." We conclude that there was competent and sufficient evidence to show that a five-lot subdivision would likely not have been approved because of the mistakes in the acreage and boundaries of the tract:

## III

### A

■ Selag and Seafirst next contend that even if the Murrs could have obtained only four building lots from the tract, this entitled them only to an abatement of the

purchase price, not to rescission. Rescission is an equitable remedy aimed at restoring the parties to their pre-contract status quo, *Blinzler v. Andrews*, 94 Idaho 215, 485 P.2d 957 (1971), *overruled on other grounds, Barnard & Son, Inc. v. Akins*, 109 Idaho 466, 708 P.2d 871 (1985), and is proper where a mutual mistake of fact is material or fundamental to the creation of a contract. 77 AM.JUR.2D *Vendor And Purchaser* §§ 538, 552 (1975); RESTATEMENT (SECOND) OF CONTRACTS § 152 chapter 6 (1981) (hereinafter RESTATEMENT); D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 4.3 at 256 (1973) (hereinafter DOBBS).

> No fault is necessary to warrant rescission of such a contract, though rescission is also available where the defendant is guilty of fault, such as fraud. But it does not follow that rescission is given for every serious mistake. The parties may have changed position, or restoration may be extremely difficult to compute with any assurance of accuracy, or rescission and restitution may be a radical and destructive remedy where an award of damages may repair the mistake with a minimum of dislocation. Thus the remedy is neither given nor withheld automatically, but is awarded as a matter of judgment.

*Dobbs* at 256. *See generally* Annotation, *Mistake In Quantity Of Land, Relief*, 1 A.L.R.2d 9 (1948).

■ Here, Seafirst and Selag contend that the Murrs failed to prove the materiality of the acreage shortage, making rescission inappropriate. Of course, it is elementary that the Murrs had the burden to prove facts entitling them to rescission. Appellants note that the Idaho Supreme Court has been reluctant to uphold the granting of extraordinary equitable remedies where an award of damages will adequately compensate the plaintiff. *See, e.g., Watkins v. Paul*, 95 Idaho 499, 511 P.2d 781 (1973); *Suchan v. Rutherford*, 90 Idaho 288, 410 P.2d 434 (1966) (specific performance denied to seller). In *Watkins* the trial court had refused the plaintiff's request to compel the owner of real estate to specifically perform an agreement to sell the property. In upholding this ruling the Supreme Court said:

> Here, as in *Suchan v. Rutherford, supra*, "[i]t cannot be seriously contended that the remedy at law via damages was not adequate, plain, speedy, and complete in this case." *Id.* at 303, 410 P.2d at 443. The evidence fails to show that the plaintiffs need the land in question for any particular, unique purpose, which is one of the main reasons for granting specific performance; on the contrary, plaintiffs' own evidence shows that they seek to obtain the land only so that they may resell it for profit. Under these circumstances, specific performance would bring the plaintiffs no greater relief than would damages in the amount of their lost profit.

> Therefore, even if the Watkins possess an enforceable right of first refusal, and even if the Richardsons were not bona fide purchasers for value without notice, this is not a proper case for specific performance, and that relief was properly denied.

*Watkins v. Paul, supra*, 95 Idaho at 501, 511 P.2d at 783. Neither of these Idaho cases involved a shortage in the acreage of the property due to a mistake. However, appellants contend that the case of *Capps v. Clark*, 196 Iowa 758, 195 N.W. 372 (1923) supports their position. In *Capps* the Iowa Supreme Court held that where both parties are innocently mistaken about the amount of acreage, where the purchaser can use the remaining part of the land for the intended purpose, and where the abatement of purchase price will adequately compensate the buyers, then rescission is not the proper remedy. The court also noted that where both parties are innocent, the equities of the defendant should be guarded as carefully as those of the plaintiff.

Here, no fraud on the part of Selag was shown. The misrepresentation by Selag

and its agents was unintentional due to a mistake in an official plat of LeBaron Estates recorded seven years before Selag purchased the tract in question. Selag had no part in the platting; it had the same right as the Murrs to rely on the plat. When the Murrs purchased the property existing fences were in their correct location. Only 5.24 acres were enclosed, so the Murrs could see what they were actually buying. The parties were innocently and mutually mistaken about the actual acreage of the tract.

William Murr never testified that he would not have purchased the property if he had known it contained only 5.24 acres rather than 5.64. He said only that he would not have agreed to pay $105,000 for the property. As we have noted, the Murrs' intention in purchasing the tract was to subdivide and construct single family dwellings on the lots for resale. William Murr testified that his expected profit would be less if he could sell only four larger lots rather than five one-acre lots. However, he offered no proof as to what the loss of profit would be. The evidence shows only that he believed each of the five one-acre lots was worth $21,000. He did not testify what four slightly larger lots would be worth given his proposed plans to subdivide, improve and sell the property.

We believe that the Murrs' intended use of the property did not weigh in favor of the remedy of rescission as opposed to an abatement of the purchase price. The Murrs still owed Selag $48,000 for the purchase price at the time of trial. The most favorable inference that could be drawn from William Murr's testimony was that he had been damaged by the cost of one "lot," or $21,000. In addition to that, he testified to certain surveying costs that he incurred to establish the correct boundaries of the tract. The total of his claimed damage fell far short of $48,000. Given these facts, rescission was not necessary. The court could have provided for abatement of the purchase price through the simple device of offsetting the balance due on the Murrs'

promissory note by the amount of the Murrs' loss. Seafirst, as the holder of the note by assignment from Selag, could not object to this remedy because Seafirst took the note with the knowledge of, and subject to, the claim of the Murrs for an abatement of the purchase price.

However, one additional factor should be taken into account in reviewing the district judge's discretionary decision to grant rescission rather than to order abatement. Here, there was more than a mere mistake as to the acreage contained in "Lot 1 of Block 1" of LeBaron Estates. The tract itself was erroneously surveyed and platted so that its platted boundaries overlapped the well-established boundaries of the adjoining property. To fully correct this mistake, the court would need to approve and adopt a survey of the property and order correction or modification of several documents, including, perhaps, the recorded plat itself. We conclude that the task of unwinding these title problems should not be forced upon the Murrs who had not bargained for them. *Compare Brown v. Yacht Club of Coeur d'Alene, Ltd.*, 111 Idaho 195, 722 P.2d 1062 (Ct.App.1986) (cloud on title to property is sufficient grounds for buyer to rescind executory contract). Given this additional factor, we cannot say that the district court abused its discretion in opting to rescind the sale rather than specifically enforcing a modified agreement upon the parties.

B

As part of its argument against the rescissionary remedy, Seafirst contends that the restitutionary relief given to the Murrs was improper. Restitution is universally ordered following rescission to achieve the pre-contract status quo. DOBBS § 11.3. *See also* 66 AM.JUR.2D *Restitution And Implied Contracts* § 11 (1973); RESTATEMENT § 158 comment b. "[I]n the case of a sufficiently serious mistake by the parties, there may be a 'rescission' and restitution of *both* parties to the position they were in before the agreement." DOBBS,

§ 11.3 at 722 (emphasis added); *Blinzler v. Andrews*, 94 Idaho 215, 485 P.2d 957 (1971). *Accord Hagar v. Mobley*, 638 P.2d 127 (Wyo.1981). As noted earlier, where—as here—both parties are innocent, the court should guard the equities of the defendant as carefully as those of the plaintiff. *Capps v. Clark, supra.* In his conclusions of law—adopted verbatim from findings and conclusions prepared by counsel for the Murrs—the district judge made no mention of Selag's "equities." The judge concluded only that the Murrs were entitled to "restoration to their position prior to the time they entered into the contract with Selag." This was accomplished, as we shall discuss, entirely at the expense of Selag and Seafirst.

The district court determined the amount of restitution due the Murrs as follows. The court found that the Murrs had paid the expenses shown in column A; that all of these were necessary and reasonable expenses "to protect the Murrs' interest and claim."

| | | A | B |
|---|---|---|---|
| 1. | Initial payment | 1,000. | 539. |
| 2. | Escrow payment | 24,099. | 12,530. |
| 3. | Payment made to prior deeds of trust (Aslett) | 6,809. | 3,468. |
| | and to S.V.M.C. | 3,620. | 1,684. |
| 4. | Total property taxes | 1,256. | 489. |
| 5. | Total engineering expenses | 2,106. | 779. |
| 6. | Total attorney fees | 20,439. | 2,304. |
| 7. | Fees paid to consultant, witness | 1,100. | |
| 8. | Attorney fees awarded to third party defendant, Odmark | 2,549. | 224. |
| | | $62,978. | $22,017. |

The court also added prejudgment interest on each payment from the date of payment to the date of its decision as shown in column B. Thus, the court ordered the total restitution due the Murrs was $84,995. Both Selag and Seafirst were held to be jointly responsible for payment of the judgment. Lot 1, Block 1 of LeBaron Estates would be "relinquished" to Selag or Seafirst when the judgment was paid. The costs and attorney fees awarded in items 6 and 8 were held to be "consequential damages recoverable by the plaintiff[s] to restore them to the status quo." Presumably as an additional ground for awarding

fees, the court stated that Selag and Seafirst's defense of the Murrs' suit was "frivolous, unreasonable and without foundation." These rulings have precipitated several issues on appeal.

## IV

■ Seafirst contends first that the district court erred in holding it jointly liable with Selag for payment of any restitution to the Murrs. The Murrs contend that Seafirst is not even entitled to raise this issue because of a pretrial stipulation entered into between former counsel for Selag and Seafirst and counsel for the Murrs. The written stipulation stated that "[t]he only issue of law which remains to be litigated is whether or not the remedy of rescission is the proper remedy for the plaintiffs." On the morning of trial the court signed a pretrial order which by reference adopted the stipulation.

Following trial, Seafirst obtained independent counsel who moved to amend the pretrial stipulation and pleadings under I.R.C.P. 15(b) to conform to the evidence submitted at trial on the issue of Seafirst's joint and several liability for any restitutionary relief. The motion was denied. The court subsequently stated in its amended findings and conclusions of law that the trial had "proceeded solely on the issues set out in said Pre–Trial Order and Stipulation" and that "the defendants are bound by the terms of the Pre-trial order."

We think the admissions in the stipulation cut both ways. Although certain admissions of the parties are set forth in the stipulation, nowhere in it is there any clear indication that Seafirst conceded it had joint and several liability for restitutionary relief due the Murrs. Moreover, the record shows that Seafirst's counsel timely asserted his belief that this issue remained for trial. Finally, evidence was admitted at trial on this issue. We conclude, therefore, that the issue of Seafirst's liability for any restitutionary relief due from Selag to the Murrs was preserved and is before us on this appeal. We will now turn to that issue.

The district court found that by virtue of the assignment to Seafirst of the Murrs' note and deed of trust and because of the terms of the Selag–Apsey–Seafirst written agreement, Seafirst became the owner of the Murr deed of trust and claim for rescission, and agreed to be responsible as owner for all the obligations of Selag to the Murrs. The court concluded that Seafirst "assumed not only the benefits, but also the obligations of their [sic] predecessor Selag to the [Murrs]."

Seafirst contends that the court erred in making this finding and conclusion. Seafirst also contends that in interpreting the Selag–Apsey–Seafirst agreement, Washington law must be applied, because the agreement so provided. On the latter question we hold that as to the point at issue here, the law of Washington and Idaho is the same. We start our review of the first question with the following general rules.

A transferee of property or contract rights is not personally liable for third party claims affecting the property or arising from acts of the transferor, in the absence of proof that the transferee assumed and agreed to pay such obligations. *Perkins v. Brown*, 179 Wash. 597, 38 P.2d 253 (1934); *People's Savings & Loan Association v. Cram*, 172 Wash. 117, 19 P.2d 667 (1933); *Hardinger v. Fullerton*, 165 Wash. 483, 5 P.2d 987 (1931); *Higgenbotham v. Topel*, 9 Wash.App. 254, 511 P.2d 1365 (1973). This principle is the general rule. It is recognized in Idaho.[2] *Klundt v. Carothers*, 96 Idaho 782, 537 P.2d 62 (1975); *Hinckley Estate Co. v. Gurry*, 53 Idaho 551, 26 P.2d 121 (1933); *Siekman v. Moler*, 47 Idaho 446, 276 P. 309 (1929).

An assignee's assumption of an assignor's liabilities is never presumed, and the burden of proof is upon the party who asserts that there has been an assumption. *Hinckley Estate Co. v. Gurry, supra;*

*Higgenbotham v. Topel, supra.* The court will refuse to hold a grantee liable for his grantor's obligations unless the alleged proof of assumption is "clear and unequivocal." *People's Savings & Loan Association v. Cram, supra; cf., Siekman v. Moler, supra* at 454, 276 P. at 312 (proof of grantee's assumption of grantor's obligation must be "clear, satisfactory and convincing.").

A related rule is that a party who is not a holder in due course and who takes a promissory note by assignment takes the note "subject to" all valid claims to it on the part of any person and all defenses of any party. I.C. § 28–3–306. The effect given to the words "subject to" is that the obligor on the note may assert setoffs against it or may have defenses that make the note uncollectible, but the obligor cannot make affirmative claims for damages against the note assignee based upon some tort or breach of contract by the original payee. *See, e.g., Siekman v. Moler, supra; Lydig Construction, Inc. v. Rainier Bank*, 40 Wash.App. 141, 697 P.2d 1019 (1985).

Here, it is uncontested that when Seafirst took an assignment of the Murr note and deed of trust, Seafirst had knowledge of the Murr claim, which at that time was a claim for an abatement of the purchase price. This means that Seafirst took the note subject to valid defenses or setoffs. However, if there was a mere assignment only, without an express assumption of Selag's liability for affirmative claims of third parties, Seafirst's liability was limited by the general rules stated above.

Two documents must be examined and construed together to determine whether Seafirst assumed liability for the claims made by the Murrs against Seafirst. One is Selag's assignment of the Murrs' note and deed of trust. The other is the Selag–Apsey–Seafirst agreement.

The assignment only purports to transfer to Seafirst all beneficial interest under that

2. In the present case we are not dealing with a situation where the assignee of the seller took part in making the sale. Nor in this case has

the assignee received any payments from the purchaser of the misrepresented property.

certain deed of trust executed by the Murrs "together with [the] note ... the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust." The assignment fails to express any intent by Seafirst to assume liability for the affirmative claims the Murrs have made against Selag.

The Selag–Apsey–Seafirst agreement is more troublesome. The Murrs contend that it contains an express agreement by Seafirst to assume all liability which Selag may have to the Murrs on the Murrs' claim against Selag for rescission and restitutionary relief. The district court agreed. Seafirst contends that no such meaning should be given to the agreement. Moreover, Seafirst urges that such an interpretation can be made only upon proof that is "clear, satisfactory and convincing," a standard of proof that was not articulated by the district judge.

The district judge gave no indication of his view as to whether the agreement was ambiguous.[3] The judge simply adopted, verbatim, findings prepared by the Murrs' counsel. Finding no. 13 said:

That pursuant to the terms of said written agreement, SeaFirst was assigned the Murr note and deed of trust. By taking that assignment and pursuant to the terms of said agreement, SeaFirst became the owner of the Murr Deed of Trust and claim for rescission, and agreed to take full responsibility for said Murr claim taking all rights and agreeing to be responsible as owner for all the obligations of Selag to the Murrs.

We can only assume that the district court thought that the relevant provisions of the agreement were unambiguous. However, whether the agreement is ambiguous is a question of law. *See Clark v. St. Paul Property and Liability Ins. Companies,* 102 Idaho 756, 639 P.2d 454 (1981). We are

not bound by any holding of the district court on this question. *Laight v. Idaho First National Bank,* 108 Idaho 211, 697 P.2d 1225 (Ct.App.1985).

A contract is ambiguous if it is "reasonably subject to conflicting interpretation." *Rutter v. McLaughlin,* 101 Idaho 292, 293, 612 P.2d 135, 136 (1980). We must construe the contract as a whole and consider it in its entirety to determine whether it is reasonably subject to conflicting interpretations. *Beal v. Mars Larsen Ranch Corporation, Inc.,* 99 Idaho 662, 586 P.2d 1378 (1978). *Id.* at 213, 697 P.2d at 1257. Interpretation of an ambiguous document presents a question of fact. On the other hand, interpretation of an unambiguous document is a question of law. *DeLancey v. DeLancey,* 110 Idaho 63, 714 P.2d 32 (1986).

As we have noted, the Selag–Apsey–Seafirst agreement was entered into in January, 1982, after Selag and its owner, Fred Apsey, defaulted on a $1,400,000 construction loan on a condominium project financed by Seafirst in 1979. To avoid foreclosure and to limit Apsey's personal liability, Selag and Apsey agreed to transfer Selag's entire interest in the condominium project, including several unsold units, to Seafirst. Apsey agreed to make payments to Seafirst totaling $83,400. Selag also transferred its other assets to Seafirst, including the Murrs' $48,000 note and deed of trust on the LeBaron Estate property. These transfers and payments were to satisfy the more than $1,225,000 owing to Seafirst from Selag and Apsey on the loan.

The agreement recognized that some of the transferred assets were subject to separate pending third-party claims. Five such claims were listed on an attached "Exhibit K." One of these was the Murrs' claim involving the LeBaron Estate property. When the agreement was executed, the Murrs were suing Selag only, asking

---

3. The judge's decision was stated in the following single sentence in a letter to counsel. "My research leads me to believe that this is the type of sale that must be rescinded and the buyer restored to his original position." He requested the Murrs' counsel to prepare proposed findings, conclusions and judgment.

for an abatement of the purchase price.[4] The agreement initially provided that:

SELAG and APSEY shall indemnify and hold harmless [Seafirst] from and against any and all loss, cost or expenses including attorney fees as a result of any claims, known or unknown, that have accrued prior to and including the date of closing of this transaction, against SELAG, APSEY and said properties,....

These provisions were modified by a three-page "First Amendment" which bears the same date as the agreement. The amendment recited that Seafirst would establish a "Claims Account" in the amount of $22,593 from funds it held as additional security for the $1,400,000 loan. The critical language of the amendment is as follows. The claims account

shall be the sole property of [Seafirst], and no other party except [Seafirst] and Apsey shall have an interest in the Claims Account. The Claims Account shall be for the purpose of paying all losses[,] costs and expenses, including attorney fees from the date of this Agreement, in order of priority as set forth below, that may be sustained or incurred by [Seafirst] or Apsey as a result of the indemnity to ... [a title company] ... in regards to the Thompson–Anderson D/T (claim no. 5 Exhibit K), and any other loss[,] cost or expenses incurred by [Seafirst] or Apsey in regard to the other claims identified in Exhibit K of this Agreement; provided the funds shall be held at [Seafirst] until all claims have been settled, and they then shall be disbursed in order of priority as follows (as referred to in Exhibit K):

First: Thompson–Anderson D/T (claim no. 5), plus costs and attorney fees.

Second: [a small claims judgment] (claim no. 4).

Third: Murr–Le Barron [sic] claim (claim no. 3) plus all costs and attorney fees.

Fourth: Anderson Suit (claim no. 1).

Fifth: Thomas Suit (claim no. 2).

Sixth: Any remaining attorney fees, cost and expenses, to be prorated between the parties hereto by amounts expended if insufficient funds.

Seventh: The remainder to be split 50/50 between Apsey and [Seafirst].

If for any reason there are no funds to reimburse Apsey and/or [Seafirst] for their respective loss[,] cost [or] expenses including attorney fees, then in that event each party shall suffer its own loss[,] cost [or] expenses including attorney fees with no right of contribution from the other.

[Seafirst] and Apsey shall jointly handle the Thompson–Anderson D/T (claim no. 5), but this shall not be held to mean that Apsey or [Seafirst] is in any manner responsible for the obligation.

[Seafirst] shall be responsible as owners of the Murr Le Barron [sic] (claim no. 3) for the handling of the matter. All other claims shall be handled by Apsey.

No funds from the Claims Account shall be paid for any indebtedness of Selag on claim no. 1 and 2. Each party shall settle their claims after consulting with the other. Any settlement shall be based upon reasonableness.

The establishment of the Claims Account shall not increase or decrease either parties' liability to each other, or to third parties including the claimants shown in Exhibit K other than to create a fund to pay the claims identified in Exhibit K.

The Murrs focus upon the paragraph which reads: "[Seafirst] shall be responsible as owners of the Murr Le Barron [sic] (claim no. 3) for the handling of the matter. All other claims shall be handled by Apsey." Their ultimate contention is that the phrase "responsible ... for the handling of the matter" means responsible for Selag's obligation, i.e., liability on the Murrs' claim." They point to differences as well

---

**4.** Three successive amendments were made to the Murrs' complaint, adding Seafirst and other defendants, adding new counts and requests for relief, including rescission and restitution.

as similarities between the wording of this paragraph and the preceding one. First, they note that the parties said Seafirst and Apsey "shall jointly *handle* the Thompson–Anderson D/T (claim no. 5), but this *shall not* be held to *mean that Apsey or Seafirst is* in any manner *responsible for the obligation.*" (Emphasis added.) They then note that the next paragraph says, "[Seafirst] *shall be responsible* as owners [sic] of the Murr Le Barron [sic] (claim no. 3) *for the handling* of the matter. All other claims shall be *handled* by Apsey." (Emphasis added.)

The Murrs argue first that *if* Seafirst was not to be "responsible for the obligation" represented by the Murrs' claim against Selag, the parties would have said so as they did in the preceding paragraph relating to the Thompson/Anderson deed of trust. The weakness of this argument is inconsistency. If the parties say—in the first paragraph—that to "handle" the claim does not mean responsibility for the obligation, then the use of the phrase "handling of the matter" in the next paragraph should not be taken to mean something different. Having once said what the term "handle" did *not* mean, there was no particular reason to repeat it.

We are not persuaded that the parties to this agreement would deliberately choose the phrase "handling of the matter" to mean that Seafirst was agreeing to assume open-ended liability for a third-party claim. "Handle" carries no such connotation. In the context here, the word would mean "manage, control, direct;" "to supervise, oversee, or control ... or persuade to a particular course of action or conduct;" "to deal with: act upon: dispose of: perform some function with regard to...." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1027 (1976).

Admittedly, not all of the language of the agreement is clear. The Murrs argue that the following underlined phrase must be given some meaning, and that its only meaning is favorable to them. "[Seafirst] shall be responsible <u>as owners</u> [sic] <u>of the</u> <u>Murr Le Barron</u> [sic] (<u>claim</u> no. 3) for the handling of the matter." Of course, the *Murrs* were the owners of the claim. Seafirst was the "owner" of the Murr LeBaron deed of trust and note. What the parties intended by this phrase is not discernible from the phrase alone. However, from the overall context it is apparent that Seafirst became owner of an asset which was subject to a claim. This may be all that was intended by the phrase. In any event, the lack of clarity in this phrase does not affect our construction of the entire agreement because the overall intent is clear.

The agreement shows the parties' intent that Apsey and Seafirst would endeavor to settle the five claims against the assets transferred to Seafirst. To facilitate the settlement process the "Claims Account" was set up from "[c]ash held by [Seafirst] as additional security for [its loan to Selag]." In creating the claims account in the "First Amendment," the parties modified an earlier provision in the agreement which required Selag and Apsey to "indemnify and hold harmless [Seafirst] from and against *any and all* loss, cost or expenses including attorney's fees as a result of any claims ... against SELAG, APSEY *and said properties.*" (Emphasis added.) The amendment stated that when "all claims have been settled" the $22,593 in the claims account would be disbursed by Seafirst in a certain priority to Seafirst and Apsey for the purpose of paying all losses, costs and expenses that might be incurred by either Seafirst or Apsey in regard to the five claims. If the claims account was insufficient for this purpose the amendment stated that "each party would suffer its own loss[,] cost [and] expenses including attorney fees with no right of contribution from the other." Thus, while these provisions modified Apsey's previously unlimited indemnity agreement, the provisions do not necessarily create any new liability on the part of Seafirst to any of the claimants. It is clear that the claims account was to be the sole property of Seafirst, and no other party except Seafirst and Apsey was to have an interest in it. By express provi-

sions, the account was for the benefit of Seafirst and Apsey only.

The final paragraph of the amended agreement is important and must be considered in construing less clear language used elsewhere. We repeat it here.

> The establishment of the Claims Account shall not increase or decrease either parties' liability to each other, or to third parties including the claimants shown in Exhibit K other than to create a fund to pay the claims identified in Exhibit K.

We believe this language precludes the meaning which the Murrs and the district court would attribute to the agreement. In establishing the claims account Seafirst did not intend to increase its potential liability to the Murrs.

Obviously, Seafirst did anticipate that it might suffer some "loss, costs or expenses including attorney's fees" because of the Murrs' claim. Seafirst agreed to absorb such loss and expense to the extent that the claims account funds did not reimburse Seafirst. Seafirst would suffer a "loss" if the asset it received—the Murrs' note—had to be discounted in value to settle the claim, or if the court in the Murr–Selag suit were to hold that the Murrs were entitled to an offset against the $48,000 balance due on the note. This suggested meaning of the agreement is consistent with the language in the final paragraph. The Murrs' suggested meaning is in direct conflict. Thus, we hold that the critical finding of fact no. 13, quoted earlier in this opinion, is not supported by the evidence.

■ The Murrs rely upon one other document to support their argument that Seafirst—even before trial—conceded its liability on the Murrs' claim. In part IV of this opinion we mentioned that shortly before trial, counsel entered into a pretrial stipulation prepared by the Murrs' counsel. The stipulation contains the following statement.

> Defendant Selag Corporation and SeaFirst Mortgage Corportion have admitted

that pursuant to an assignment dated January 20, 1982, SeaFirst Mortgage Corporation become the holder of all the beneficial interests of Selag Development Company under that certain deed of trust dated September 22, 1980, executed by William and Margaret Murr, Grantors, to Title & Trust Company, as trustee, recorded October 9, 1980, as Instrument No. 207749 in the records of Blaine County, Idaho, and that said assignment included as well all notes described to [sic] or referred to in said deed of trust together with interest and all rights and obligations accrued or to accrue under said deed of trust.

This language merely shows that the assignment of the Murrs' deed of trust to Seafirst "included ... all rights and obligations accrued or to accrue under said deed of trust." The "obligations" referred to could mean those of the Murrs or those of Selag. Although it is by no means certain, we will assume that "obligations" mean obligations of Selag under the deed of trust. A beneficiary of a deed of trust does have certain limited obligations. *See, e.g.,* I.C. § 45–1514. On the other hand, the Murrs' claim for rescission and restitutionary relief is not one "accrued ... under said deed of trust." The Murrs' claim arises wholly independent from the deed of trust. The stipulation language falls short of creating liability in Seafirst for the Murrs' claim.

Finally, the Murrs point to their counsel's cross-examination of Fred Apsey regarding the Selag–Apsey–Seafirst agreement. The questions put to Apsey about the responsibility for "handling" the various claims danced around the issue of liability for the claims. The question of whether the parties to the agreement intended the language to mean that Seafirst would assume all liability of Selag on the Murrs' claim was neither asked nor answered during Apsey's testimony.

■ We conclude that the Murrs have failed to meet their burden of proving that Seafirst agreed to assume all liability

of Selag on the Murrs' claim. The establishment of the claims account did not create any new liability on Seafirst's part to the Murrs. No party other than Seafirst and Apsey has any interest in the claims account. Accordingly, we must reverse the judgment entered by the district court against Seafirst. We also reverse that part of the judgment imposing a trust upon the claims account. We vacate the judgment entered against Selag and remand for the district court to consider the equities of Selag as well as those of the Murrs in arriving at proper restitutionary relief. DOBBS § 11.2 at 722; *Blinzler v. Andrews,* 94 Idaho 215, 485 P.2d 957 (1971). The award of attorney fees to the Murrs against Selag must be reconsidered even if the other restitutionary items in the judgment are reinstated. In this instance, the main award of attorney fees is not supportable as an item of "consequential damages." Neither can it be said that the defense in this case by Selag or Seafirst was frivolous, unreasonable or without foundation, so as to allow an award under former I.C. § 12–121. Additionally, our decision in *Murr v. Odmark,* 112 Idaho 606, 733 P.2d 827 (Ct.App.1987), will, of course, be considered. Any award of attorney fees in this case will not bear prejudgment interest. *Camp v. Jiminez,* 107 Idaho 878, 693 P.2d 1080 (Ct.App.1984).

No costs or attorney fees are awarded on this appeal.

WALTERS, C.J., concurs.

BURNETT, Judge, specially concurring.

The Court today sustains the judgment of rescission, but holds that the Murrs are not entitled to restitution from Seafirst. Thus, the effect of today's decision is that the Murrs are absolved of any further obligation on the promissory note but they cannot recover from Seafirst the expenditures they have made on the subject property. Although I agree with this "bottom line" result, I think it is better supported by an alternative line of reasoning. I will outline this alternative briefly.

Mutual mistake calls forth an equitable remedy. The questions presented are how this remedy should be determined in the first instance and how it later should be reviewed on appeal. Many courts have spoken to the difficulties of choosing an appropriate remedy. Most agree that a court in equity possesses "discretion" to fix a remedy so long as the court's choice is not contrary to established equitable principles. *See, e.g., HBOP, Ltd. v. Delhi Gas Pipeline Corporation,* 645 P.2d 1042 (Okla.Ct.App.1982). However, a distinct preference exists for selecting the remedy least disruptive to the underlying transaction from which the dispute arises. This preference is particularly marked in situations where there is a choice between rescission and some other remedy. D. DOBBS, REMEDIES § 11.3 (1973) (hereinafter "DOBBS").

On appeal, several courts have denominated the standard of review as one of "abuse of discretion." *See, e.g., Scott v. Hjelm,* 188 Mont. 375, 613 P.2d 1385 (1980); *Mulder v. Mittelstadt,* 120 Wis.2d 103, 352 N.W.2d 223 (Ct.App.1984). However, many other appellate courts adhere to the *de novo* standard historically found in equity cases. They will express their own judgment on the choice of a remedy. *E.g., Cuzick v. Lesly,* 16 Ark.App. 237, 700 S.W.2d 63 (1985); *Hilo Crane Service, Inc. v. Ho,* 5 Hawaii App. 360, 693 P.2d 412 (1984); *Bartlett v. Whidden,* 252 Or. 501, 449 P.2d 850 (1969). However, they will defer to the lower court's findings of fact. *See Town of Eustis v. Stratton–Eustis Development Corp.,* 516 A.2d 951 (Me.1986).

Our Court has hinted at the *de novo* standard. In *Thieme v. Worst,* 113 Idaho 455, 745 P.2d 1076 (Ct.App. 1987), we upheld a trial judge's choice of a remedy less drastic than rescission. We expressed our own view as to the proper outcome, stating that "the trial judge fashioned the correct remedy." *Id.* at 459, 745 P.2d at 1080. We went on to suggest that discretion does not necessarily imply broad appellate deference. "As long as the trial court properly exercises its discretion, *within permitted bounds,* we will defer to that court's discretionary authority to determine the appro-

priate ... relief as the circumstances and justice require." *Id.* at 460, 745 P.2d at 1081 (emphasis added). *See also Dursteler v. Dursteler,* 108 Idaho 230, 697 P.2d 1244 (Ct.App.1985) (altering restitutionary remedy chosen by trial court).

In the present case, I believe the choice of rescission would fail even a deferential test. The district judge stated no reasons for his choice. Absent such an explanation, we cannot justify the sweeping deference inherent in an "abuse of discretion" review. The remedy of rescission is seldom preferred in cases where a vendor and purchaser enter into a contract for the sale of land under a mutually mistaken assumption as to the size of the parcel. The courts long have recognized the appropriateness of a less intrusive remedy, abatement, in such cases. As stated by the presiding judge in *Hill v. Buckley,* 34 Eng. Rep. 153, 155 (1811), "Where a misrepresentation is made as to the quantity, though innocently, I apprehend the right of the purchaser to be what the vendor can give; with an abatement out of the purchase-money for so much as the quantity falls short of the representation." This approach commends itself even where the amount of acreage thought to be conveyed is a critical element of a purchaser's plan to subdivide. As our Supreme Court has noted, specific performance and "damages" or "restitution" often are adequate to compensate a purchaser for any overpayment due to a deficiency in the size of the purchased tract. *Simpson v. Johnson,* 100 Idaho 357, 597 P.2d 600 (1979). *See generally,* DOBBS § 12.10. The remedy of performance plus abatement is particularly appropriate where the purchaser can still make substantial use of the remaining part of the land. *See Harris v. Axline,* 323 Mich. 585, 36 N.W.2d 154 (1940) (trial court decree granting rescission set aside where frontage of lot was 34, rather than 40, feet long, but where court concluded that purchasers could still commercially develop property as planned).

In my view, abatement was the preferred remedy in this case. Had this remedy been chosen, we could have avoided the nettlesome issue of Seafirst's alleged obligation to pay restitution to the Murrs. In place of that issue we would have confronted the narrower question whether the Murrs would remain liable to Seafirst on the promissory note. In my view, the answer to that question would be "no." As stated in this Court's lead opinion, Seafirst allowed the property to be sold in foreclosure after the district judge announced his intention to grant rescission. By this conduct Seafirst effectively waived its right on appeal, or in any subsequent proceedings, to insist upon enforcement of the promissory note. There is no longer any mutuality of obligation underlying the note. A court in equity will not enforce a unilateral obligation. The Murrs would be entitled to relief from the balance of the abated obligation on the note.

Thus, my analysis leads me to the same "bottom line" result reached by my colleagues. The Murrs take nothing from Seafirst, and Seafirst takes nothing from the Murrs. The parties bear their own losses—which were, after all, occasioned by a mutual mistake in a speculative commercial venture. This, I conclude, is the most equitable result available in an unhappy case.